# In the United States Court of Federal Claims

No. 09-741 L
(Filed: June 24, 2011)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| | * | |
| **FARMERS COOPERATIVE CO., et al.,** | * | Rails to Trails; Scope of Easement; |
| | * | "Railroad Purposes"; Abandonment; |
| **Plaintiffs,** | * | Notice of Consummation of Abandonment; |
| | * | Quitclaim; Trail Use Agreement; Vacation |
| v. | * | of NITU; Series of NITUs; Subsequent |
| | * | Failure to Reach Trail Use Agreements; |
| **THE UNITED STATES,** | * | Temporary Takings |
| | * | |
| **Defendant.** | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*R. Deryl Edwards, Jr.*, Law Offices of R. Deryl Edwards, Jr., Joplin, Missouri, for Plaintiffs.

*Mark S. Barron*, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

DAMICH, Judge:

This is a "rails to trails" case in which Plaintiffs seek a judgment of liability against the United States for a Fifth Amendment taking of their properties subject to a railroad right-of-way held by Kansas & Oklahoma Railroad ("K&O") in Comanche, Kiowa, Pratt, and Hodgeman Counties, Kansas. Defendant has cross-moved for partial summary judgment on liability or, in the alternative, for a judgment limiting liability to that of a temporary taking.

Although the railroad rights-of-way in question were never in fact used as recreational trails pursuant to the National Trails System Act, 16 U.S.C. § 1241 et seq. (2006) ("the Trails Act"), the court finds that the actions of the Surface Transportation Board ("STB"), a federal agency that is the successor to the Interstate Commerce Commission ("ICC" or "the Commission") and affiliated with the United States Department of Transportation, did constitute a taking of Plaintiffs' property rights on a temporary basis.

For the reasons stated below, the Court therefore grants Plaintiffs' motion for partial summary judgment but only in part, in that Defendant is liable for a taking, but the taking was of temporary duration. The Court grants-in-part and denies-in-part Defendant's cross-motion. The

Defendant is liable for a temporary taking, but the duration of the temporary taking is longer than that asserted, in the alternative, in Defendant's cross-motion.[1]

    I.       Background

        A.  The Trails Act

"[T]he purpose of the Trails Act was to preserve unused railroad rights-of-way by converting them into recreational trails." *Barclay v. United States*, 443 F.3d 1368, 1371 (Fed. Cir. 2006). It is settled law, however, that "a Fifth Amendment taking occurs in Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010).

Railroads must seek the approval of the STB to officially discontinue or abandon use of a railroad corridor. *Nat'l Ass'n of Reversionary Prop. Owners ("NARPO") v. STB*, 158 F.3d 135, 137 (D.C. Cir. 1998). The Trails Act provides for a process called "railbanking" as an alternative to discontinuance or abandonment. *Caldwell v. United States*, 391 F.3d 1226, 1229 (Fed. Cir. 2004). The right-of-way is said to be "'banked' until such time as railroad service is restored." *Caldwell v. United States*, 57 Fed. Cl. 193, 194 (2003), *aff'd* 391 F.3d 1226 (Fed. Cir. 2004).

The process of abandonment begins with either an Application or what is called a "Notice of Exemption," which is a less involved process. After the Application or Notice of Exemption is filed, a proposed trail operator, such as a state, municipality, or private group, can submit a proposal for converting the railway to a trail. The proposal "must include a statement of willingness to manage the corridor, assume liability, and pay taxes." *NARPO*, 158 F.3d at 138. If the railroad and the proposed trail operator indicate a willingness to negotiate a trail use agreement, "the STB stays the abandonment process and issues a notice allowing the railroad right-of-way to be 'railbanked.'" *Caldwell,* 391 F.3d at 1229.[2] The determination of the railroad whether to engage in such negotiations is voluntary. *Nat'l Wildlife Fed'n v. Interstate Commerce Comm'n*, 850 F.2d 694, 702 (D.C. Cir. 1988). If the railroad agrees to negotiate a Trails Act agreement, however, the STB is required to issue a "NITU" ("Notice of Interim Trail Use or Abandonment"), in exemption proceedings, or a "CITU" ("Certificate of Interim Trail Use or Abandonment"), in abandonment application proceedings. *Barclay*, 443 F.3d at 1376; *Capreal v. United States*, 2011 WL 1740543, May 6, 2011, at *2. If a trail use agreement is not reached, the NITU expires 180 days after its issuance.

---

[1] The court finds the duration of the taking extends from the grant of the initial NITU through the expiration of the final NITU regarding each corridor, rather than a series of independent takings extending only for the duration of each separate NITU.

[2] Thus, for the railroad, interim trail use is more like discontinuance but without retaining liability, while theoretically "preserving the rail corridor for possible reactivation of service in the future." *Preseault v. Interstate Commerce Commission* ("*Preseault I*"), 494 U.S. 1, 5 n.3 (1990).


This case involves a NITU, which "permits the railroad to discontinue service, cancel tariffs, and salvage track and other equipment, 'consistent with interim trail use and rail banking' without consummating an abandonment." *Caldwell*, 391 F.3d at 1230. If an agreement is reached between the railroad and the trail operator, "the NITU extends indefinitely to permit interim[3] trail use." *Id*. The STB's issuance of the NITU suspends exemption proceedings for 180 days to allow for negotiation of an agreement. *Barclay*, 443 F.3d at 1371; 49 C.F.R. § 1152.29(b)(2) and (d). "If no trail use agreement is reached, the NITU converts into an effective notice of abandonment, allowing the railroad to 'abandon the line entirely and liquidate its interest.'" *Id*. (quoting *Preseault I*, 494 U.S. at 7); *see also Ladd*, 630 F.3d at 1023 ("Alternatively, negotiations may fail, and the NITU would then convert into a notice of abandonment.").

If agreement is reached, "the STB retains jurisdiction for possible future railroad use, and state law reversionary interests that would normally vest upon abandonment are blocked." *Caldwell*, 391 F.3d at 1230. As the Federal Circuit has held: "The taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting." *Caldwell*, 391 F.3d at 1233. It has further held that successfully "entering into a trail use agreement and converting the railway to a recreational trail" are not necessary elements of a takings claim. "Hence, it is irrelevant that no trail use agreement has been reached and that no recreational trail has been established." *Ladd*, 630 F.3d at 1024. Because "the issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests," *id*., "the appropriate triggering event for any takings claim under the Trails Act occurs when the NITU is issued." *Caldwell*, 391 F.3d at 1235.

B.  Factual Background

In 1887, K&O's predecessor-in-interest, the Chicago, Kansas & Western Railroad Company ("CK&W"), acquired the easement in question through condemnation procedures under Kansas law in Comanche, Kiowa, Pratt, and Hodgeman counties. Def.'s Resp. at 6.

Plaintiffs own property under or adjacent to either of two rail line segments held by K&O running through these counties (respectively, the "CKP Corridor" and the "Hodgeman Corridor").[4] Pls.' Proposed Findings of Uncontroverted Fact, ¶¶ 1, 17-74. Pls.' Ex. 6 (Bates no. 00101).

---

[3] Trail use is deemed "'interim' because the corridor may be returned to active railroad use in the future." *NARPO*, 158 F.3d at 138 n.5 (citing *Birt v. STB*, 90 F.3d 580, 583 (D.C. Cir. 1996)).

[4] Defendant "acknowledges that each of the individual Plaintiffs has made an evidentiary showing sufficient to survive a summary judgment challenge to the Plaintiffs' standing to bring suit in this matter" but reserves the right to renew a standing challenge if warranted during any just compensation phase of this litigation. United States' Response to Plaintiffs' Motion for Partial Summary Judgment and Cross-Motion for Summary Judgment ("Def.'s Response") at 12.

On August 7, 2003, K&O filed a Notice of Exemption with the STB proposing to "abandon" the two segments. *Id*. (Bates no. 00088). It advised of its intent, upon receipt of abandonment authority, "to remove the rail, track material, and crossties." *Id*. (Bates no. 00101). It further advised that "[t]he property underlying the rights-of-way is reversionary, which would affect the transfer of the property for other than rail or rail-banking purposes." *Id*. (Bates no. 00090).

On November 12, 2003, the American Trails Association ("ATA") submitted comments to the STB and requested that a NITU be issued to allow for the possibility of railbanking of the two rights-of-way. Def.'s Ex. 1 at 1. ATA filed the requisite statement of willingness. *Id*. at 2. Also, on the same date, K&O advised the STB of its willingness to negotiate with ATA for trail usage. Pls.' Ex. 7. Consequently, on November 25, 2003, the STB issued a NITU for both the CKP and Hodgeman corridors. Pls.' Ex. 8

On April 1, 2004, K&O conveyed its interest in the two corridors to ATA via a quitclaim deed. Pls.' Ex. 9. As recorded in the land records of Pratt County on August 23, 2004, the deed conveyed to ATA "all of Grantor's interests, in lands and premises, right of way, bridges, culverts, easements, buildings, supporting structures, and other fixtures, improvements and appurtenances" in the counties of Comanche, Kiowa, Pratt, and Hodgeman in the state of Kansas. *Id*. (Bates no. 00405). On October 25, 2007, however, ATA filed a "Notice of Intent to Terminate Trail Use" with the STB asking that "it be relieved of its obligations under the Trails Act with respect to the rights-of-way in the CKP and Hodgeman corridors. Pls.' Ex. 10. In a decision dated November 9, 2007, the STB granted ATA's request to vacate the NITU, effective November 5, 2007, and stated that "K&O may fully abandon the line segments . . ." Pls.' Ex. 11.

On January 18, 2008, ATA executed (and on February 25, 2008, recorded with the Pratt County Register of Deeds) a "Disclaimer and Release," disclaiming any "right, title, or interest in or to" any of the property in the Pratt County portion of the CKP corridor. Pls.' Ex. 13.[5]

The STB subsequently issued three further NITUs regarding the CKP or Hodgeman corridors. Because no trail use agreement was reached in any of these three negotiations, all three of these NITUs expired 180 days after their issuance. Def.'s Resp. at 8-9.

These NITUs were issued as follows:

On December 31, 2007, Sunflower Recreational Trails, Inc. ("Sunflower") filed a request with the STB for the issuance of a NITU on the CKP corridor (and Statement of Willingness). Def.'s Ex. 2. On January 10, 2008, K&O informed the STB that it had not "consummated the abandonment of the line" and was willing to negotiate with Sunflower for interim trail usage. Def.'s Ex. 3.

On February 4, 2008, the STB issued a NITU on the CKP corridor. Pls.' Ex. 12. *See also* Pls.' Ex. 16 at 2 (Bates no. 00084), noting that the negotiation period for this NITU expired on August 2, 2008.

---

[5] The record before the court in the instant litigation does not reflect whether any similar disclaimer and release was recorded in Comanche and Kiowa counties as to the portion of the CKP corridor in those counties.

On February 14, 2008, Hodgeman County Economic Development ("HCED") filed a petition, and accompanying Statement of Willingness, for the issuance of a NITU on the Hodgeman corridor. Def.'s Ex. 4. K&O informed the STB that it had not consummated the abandonment of that line and was willing to negotiate with HCED. Def.'s Ex. 5. The STB granted the request on March 7. As noted above, no agreement was reached and the NITU expired on September 3, 2008.

Sunflower then expressed interest in the Hodgeman corridor. It petitioned the STB on December 16, 2008, for a NITU on the Hodgeman corridor and filed the requisite Statement of Willingness. Def.'s Ex. 6. K&O advised the STB that it had not consummated abandonment and was willing to engage in negotiations. Def.'s Ex. 7. The STB granted the request for a NITU on the Hodgeman corridor with Sunflower, Pls.' Ex. 16, but no agreement was reached and the NITU expired June 27, 2009. *Id*. at 2.

All of the NITUs, including the initial NITU issued in response to the request of ATA, provided that, if no trail use agreement was reached by the 180-day deadline, K&O "may fully abandon the line . . ." Pls.' Exs. 8 (Bates no. 00042-43), 12 (Bates no. 00061), 14 (Bates no. 00072), and 16 (Bates no. 00085).

As of the filings in this case, neither the CKP corridor nor the Hodgeman corridor was in use, or had ever been in use, as a recreational trail under the Trails Act.

II.     Standard of Review

Summary judgment is a "salutary method" of procedure under the Rules of the Court of Federal Claims ("RCFC") to dispose of actions, where warranted, in a just, speedy, and inexpensive manner. *See Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987). A motion for summary judgment will be granted if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." RCFC 56 (c )(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When considering a summary judgment motion, the court's proper role is not to "weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it "might affect the outcome of the suit;" a dispute is genuine if the evidence is such that a reasonable trier of fact could find for the nonmoving party. *Id*. at 248.

The party moving for summary judgment may prevail by demonstrating the absence of any genuine issues of material fact or by showing the absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 322-23. If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that there is a genuine issue of material fact. *Id*. at 324. Any inferences that may be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Similarly, "[i]n cases in which there is doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the nonmovant."

*Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984). "The movant also must demonstrate its entitlement to judgment as a matter of law." *Id.*

When the parties have cross-moved for summary judgment, the court reviews the motions under the same standards. *First Annapolis Bancorp., Inc. v. United States*, 75 Fed. Cl. 263, 275 (2007). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*

   III.   Discussion

      A.  Whether Defendant is Liable for a Taking

The Court analyzes this issue according to the analytical framework set up by the Federal Circuit in *Preseault v. United States ("Preseault II"),* 100 F.3d 1525 (Fed. Cir. 1996):

> Under *Preseault II*, the determinative issues for takings liability are (1) who owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate; (2) if the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and (3) even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).

*Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009).

         1. Ownership of the Right-of-Way

There is no dispute over the first of the three inquiries posed by the court in *Preseault II*. The parties agree that, as a result of state legislation enacted in 1868, the property interest in land acquired by railroads via condemnation amounts to an easement. *See Kan. Cent. Ry. Co. v. Allen*, 22 Kan. 285, 289 (1879). Thus, a landowner "whose property is subjected to condemnation for railway or other public uses is none the less the owner of the fee and holder of the ultimate title." *Harvey v. Mo. Pac. R.R. Co.*, 207 P. 761, 762 (Kan. 1922).

         2. Scope of the Easement

Under the second prong of the *Preseault II* test, the inquiry is whether the right-of-way easement first obtained by the railroad is broad enough to accommodate recreational trail usage. "[I]f the terms of the easement when first granted are broad enough under then-existing state law to encompass trail use, the servient estate holder would not be in a position to complain about the use of the easement for a permitted purpose." *Preseault II*, 100 F.3d at 1552.

Plaintiffs argue that K&O's rights-of-way in the two corridors are for "railway purposes" only, which they aver do not include trail use or railbanking. "Specifically, the right of the public to use the former right-of-way for a recreational hiking and biking trail, as contemplated by 16 U.S.C. § 1247(d) ["Interim use of railroad rights-of-way"], is not a legitimate railroad purpose recognized under Kansas law." Pls.'s Mot. at 11. "Railbanking and interim trail use . . . do not constitute public uses to which the easements in question could be shifted without causing the easements to be terminated or extinguished as a matter of law." *Id*.

In support, Plaintiffs first argue that Kansas law is clear that the easement a railroad holds is limited to railroad purposes. In *Kansas Cent. Ry. Co. v. Allen*, 22 Kan. 285 (Kan. 1879), the court explained that "[a]n easement merely gives to a railroad company a right of way in the land; that is, the right to use the land for its purposes. This includes the right to employ the land taken for the purposes of constructing, maintaining and operating a railroad thereon." *Id*. at 293. Plaintiffs argue, and this court finds persuasive, that the context of the decision clearly implies that the phrases "for use of the railroad" and "for the purposes of constructing, maintaining and operating a railroad thereon" have a meaning equivalent to "for railroad purposes."

Similarly, in *Abercrombie v. Simmons*, 81 P. 208 (Kan. 1905), the court held that the conveyance to a railroad of a strip of land, even when by a general warranty deed, nevertheless restricted the use of the land as a right-of-way and could not thereafter be conveyed to a private individual for use other than as a right-of-way for a railroad. Rhetorically, the court posed the question, "May a railroad company purchase a strip of land, extending a great distance through the country and over many farms, abandon the enterprise, and then sell the strip to those who will put it to a wholly different use; one which is might be both obnoxious and menacing to the adjoining owners?" *Id*. at 210. *Abercrombie* suggests, then, that the test is whether the subsequent usage that is contemplated is "wholly different" from the right-of-way intended by the railroad in the first instance.

Defendant does not dispute the fundamental purpose of the easements acquired by CK&W. Def.'s Resp. at 19. It argues, however, that Kansas law broadly defines these purposes, focusing on the railroad's right to "perpetual use" of the easement.[6] In support of this argument,

---

[6] For example, upon filing a copy of a certified report with the appropriate county register of deeds, the railroad

> shall have the right to occupy the land so embraced within such route, for the purposes necessary to the construction and use of its road; and to such portions of such road over which a railroad shall be actually constructed within such time, the perpetual use of such lands shall vest in such company, its successors and assigns, for the use of the railroad, as soon as so much of such railroad shall have been constructed fit for use.

Kan. Gen. Stat. ch. 23 § 84.

Defendant looks to the county commissioners' reports, which accompany the original condemnation orders and determine the extent of the easement acquired and the use thereof, and the condemnation statutes. Neither, Defendant concludes, specifically limit the railroad's use to "railroad purposes," require "active" railroad operations, or "identify any specific activities as either permissible or prohibited." Def.'s Resp. at 20. Rather than construing railroad rights-of-way narrowly, Kansas courts, it argues, "have consistently affirmed the expansive breadth of the property right the railroad acquires in a condemnation action." *Id*. at 21. The right is expansive because the state courts have described the property interest as "the right to use the land for its purposes," allowing the railroad "the free and perfect use of the surface of the land as far as necessary for all its purposes, and the right to use as much above and below the surface as may be needed." *Earlywine v. Topeka, Salina & W. Ry. Co.*, 23 P. 940, 940-41 (Kan. 1890).

Defendant, however, overlooks or at least underemphasizes that, while Kansas law suggests that a railroad may hold its easement unused for an extended period of time, it may not, however, utilize the right-of-way – or convey it to another entity – for a non-railroad purpose. *See, e.g., Atchison, Topeka & Santa Fe Ry. v. Humberg*, 675 P.2d 375, 379 (Kan. App. 1984) (railroad's non-use of right-of-way acquired for railroad purposes for a period of more than 30 years is not considered an abandonment, so long as the disputed tracts were not used "in any manner substantially at odds with the purposes for which it was acquired.").

Defendant places great emphasis on the decision in *Harvey v. Mo. Pac. R.R. Co.*, 207 P. 761 (Kan. 1922), wherein the court held against the landowner in a quiet title action regarding land within the 100-foot railroad right-of-way obtained by condemnation 43 years earlier "for railway side tracks, depots, workshops, water station and stockyards," but which had never been developed or put to use other than for the railroad track. The court held that, although the railroad had not yet needed the land within its right-of-way for those purposes, "so long as the railway has a potential need" of the land," its "rights acquired under such proceedings are not lost through lapse of time and nonuse." *Id*. at 763. The clear context in *Harvey*, however, was the potential need of the land for "railway purposes." *Id*. at 762, 763.

Kansas statutory law further informs the scope of the K&O right-of-way:

> Except where a railroad company conveys its right, title and interest in and to railroad right-of-way which it owns in fee simple, any conveyance by a railroad company of any actual or purported right, title or interest in property acquired in strips for right-of-way to any party other than the owner of the servient estate shall be null and void, unless such conveyance is made with a manifestation of intent that the railroad company's successor shall maintain railroad operations on such right-of-way.

Kan. Stat. Ann. § 66-525(f).

"Railroad operations" and "railroad purposes" seem clearly to be different from recreational trail usage. In *Toews v. United States*, 376 F.3d 1371, 1376 (Fed. Cir. 2004), the court observed

> [I]t appears beyond cavil that use of these easements for a recreational trail – for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway – is not the same use made by a railroad, involving tracks, depots, and running of trains. The different uses create different burdens.

This court finds that Kansas law is clear that the scope of K&O's easements in the CKP and Hodgeman corridors was a right-of-way for railway purposes and that such purposes are distinct from, and inconsistent with, use of the right-of-way as a recreational trail. This holding is consistent with recent Court of Federal Claims rails-to-trails decisions construing Kansas law. *See, e.g.*, *Nordhus Family Trust v. United States*, 2011 WL 1467940 (Fed. Cl. 2011) at *9; *Biery v. United States*, 2011 WL 2279653 (Fed. Cl. 2011) at *7.

Even so, Defendant notes that the purposes of the Trails Act are two-fold: recreational trail usage as well as preservation of rail corridors for future railroad use via railbanking. *Citizens Against Rails-to-Trails*, 267 F.3d at 1153. The Government argues, "[r]ailbanking – which is simply the preservation or maintenance of a railroad right-of-way for future rail use – falls squarely within a railroad company's rights as the owner of a railroad easement. Accordingly, a railroad's decision to maintain its easements for future rail use is a permissible exercise of the railroad's rights as a matter of Kansas state law." Def.'s Resp. at 24.

Defendant downplays, however, that recreational trail usage and railbanking go hand-in-hand under the Trails Act. It is not enough to argue that preservation of the railroad for future purposes is within the scope of the original easement, when the interim usage would be outside that scope. K&O did not simply seek to discontinue railroad operations indefinitely, wherein it would have retained ownership, liability, and tax responsibilities, without any implications under the Trails Act. Rather, it first proposed abandonment of the rail lines in the two corridors and then cooperated in the issuance of the NITU, staying the natural course of abandonment, while it negotiated with ATA, and subsequently with Sunflower and HCED, for their operation of one or both corridors as a recreational trail.

3. Abandonment of the Easement

The third inquiry under *Preseault II* is whether, even if the scope of the easement is broad enough to encompass trail use, the easement had terminated prior to the alleged taking. Were that the case, the property owners would have held their fees unencumbered by the easement. "The usual way in which such an easement ends is by abandonment, which causes the easement to be extinguished by operation of law. Upon an act of abandonment, the then owner of the fee estate, the 'burdened' estate, is relieved of the burden of the easement." *Preseault II*, 100 F.3d at 1545 (internal citation omitted). If, under Kansas law, the railroad had already abandoned its right-of-way, despite the railroad's subsequent willingness to negotiate with a potential trail

operator, the actions of the STB in enabling trail usage negotiations via the NITU would have constituted a taking of Plaintiffs' property.  "[T]he railroad cannot give what it does not have." *Toews*, 376 F.3d at 1376.

Kansas law holds that abandonment of a right-of-way requires "an intent to relinquish, together with external acts by which the intent is carried into effect." *Pratt v. Griese*, 409 P.2d 777, 780-81 (Kan. 1966).  The demonstration of intent and the acts must be unequivocal.  "To constitute abandonment of a railroad right-of-way there must be a uniting of intent to renounce all interest in the right-of-way with a clear and unmistakable act to carry out that intent." *Gauger v. Kansas*, 815 P.2d 501, 503 (Kan. 1991).  In 1986, the Kansas legislature clarified that "a railroad right-of-way shall be considered abandoned when: (1) The tracks, ties, and other components necessary for operation of the rail line are removed from the right-of-way *following* the issuance of an abandonment order by the appropriate federal or state authority."  Kan. Stat. Ann. § 66-525(a)(1) (emphasis added).

Plaintiffs seem to argue that K&O abandoned the two corridors even prior to the issuance of the NITU on November 25, 2003.  "The K&O did not need an order from the STB permitting abandonment, it had already practically done so under Kansas law."  Pls.' Reply at 10.  Yet, Plaintiffs have also affirmed that the tracks, ties, and other components were not removed by K&O until sometime subsequent to the issuance of the November 2003 NITU but prior to the April 2004 quitclaim deed to ATA.  Pls.' Mot. at 30; Decl. of Cara Vanderree in Support of Pls.' Mot. for Partial Summ. J. and in Opp'n to U.S. Motion, Mar. 21, 2011 (admitted without objection at oral argument, Mar. 23, 2011).

As the Federal Circuit observed in *Caldwell*, however, the NITU is itself the mechanism that provides permission to the railroad "to discontinue service, cancel tariffs, and salvage tracks and other equipment, 'consistent with interim trail use and rail banking' without consummating an abandonment." *Calwell*, 391 F.3d at 1230.  Given the interplay, then, of Kan. Stat. Ann. § 66-525(a)(1) and the STB authorization to remove the tracks, etc., it is clear that K&O did not abandon service prior to the issuance of the NITU.  "Thus, there could be no abandonment until authorized by federal law.  The NITU barred the abandonment; abandonment cannot occur after issuance of a NITU while the NITU is in effect." *Barclay*, 443 F.3d at 1374.

Because the issuance of the NITU by the STB in November 2003 forestalled the abandonment process in favor of the potential conversion of the railroad right-of-way to a use outside the scope of the original easement, it blocked the vesting of Plaintiffs' state law reversionary interests.  "A taking occurs when state law reversionary property interests are blocked." *Ladd*, 630 F.3d at 1023 (citing *Caldwell*, 391 F.3d at 1233-34).

This Court holds that the STB's issuance of the NITU on November 25, 2003, effected a taking of Plaintiffs' property interests and that their claim accrued on that date.

    B.  Duration of the Taking

The court in *Ladd* acknowledged that, "where no trail use agreement is reached, the taking may be temporary."  *Id*. at 1025.  Defendant argues that, should the court find it liable for

a taking, it should limit that liability to the periods only when the various NITUs were in effect, that is, that the court should find that the takings were temporary and ended "when the negotiation periods provided for in each NITU expired." Def.'s Resp. at 36. Defendant reasons that "in the absence of conversion of the corridor to a recreational trail, once the NITU expires there is no longer any federal government action related to the railbanking process precluding the realization of any state-law property interest Plaintiffs may possess in the underlying property." *Id*. at 37.

Under the peculiar facts of this case, the STB issued four distinct NITUs. The first NITU, issued November 25, 2003, provided for a 180-day period during which K&O and ATA engaged in negotiations to reach an agreement on interim trail usage. The NITU provided that, if no agreement were reached through the 180th day, May 23, 2004, "K&O may fully abandon the line."[7] Pls.' Ex. 8 (Bates no. 00042-43). Thus, the Defendant argues that a temporary taking caused by the first NITU would have ended on that date.

Plaintiffs, however, argue that a trail agreement was reached under the first NITU, thereby extending the duration of the temporary taking. Plaintiffs cite as evidence for the trail agreement K&O's quitclaim deed to ATA, on April 1, 2004. Defendant argues that Plaintiffs have failed to meet their burden of proof to demonstrate such an agreement. In support, Defendant notes that, since ATA is a national organization, K&O would have expected that ATA would first take the property interest and then look for a trail sponsor to enter into a trail agreement for this particular area. Tr. 28:20 to 29:1 (Oral argument, Mar. 23, 2011).

But ATA assumed responsibility for the trail and described itself as the "trail operator." ATA stated to the STB its willingness to assume financial responsibility and legal liability for the management of the right-of-way as a trail, including responsibility for the payment of taxes. Pls.' Ex. 8 (Bates no. 00041). In addition, approximately four years later, in November 2007, when ATA filed its "Notice of Intent to Terminate Trail Use," Pls.' Ex. 10, it described itself as the "trail operator" and asked that it "be relieved of its obligations under the Trails Act with respect to the above-described rights-of-way." *Id*. (Bates no. 00046). The STB also referred to ATA as the "trail manager." Pls.'s Ex. 11 (Bates no. 00050) (Decision granting ATA's request and vacating the November 2003 NITU).

In light of the quitclaim deed, ATA's reference to itself as the prospective "trail operator," and STB's reference to ATA as the "trail manager," the court finds more than sufficient evidence to conclude that K&O did in fact reach an agreement on interim trail usage. By virtue of the agreement, therefore, the NITU "extended indefinitely," *Caldwell*, 391 F.3d at 1230, and the STB retained jurisdiction, blocking Plaintiffs' reversionary interests. The STB vacated the first (2003) NITU on November 9, 2007; thus, this is the earliest date at which the temporary taking would have ended.

---

[7] The November 2003 NITU, and all of the subsequent NITUs were made subject to an environmental condition regarding geodetic station markers. This condition is not material to the issues for summary judgment pending before the court.

In the STB's decision in November 2007 vacating the original NITU at ATA's request, it advised K&O[8] that, "under the circumstances," it "may fully abandon the line segments." At that time, under Kansas law, the right of way would have been abandoned.[9] The subsequent NITUs, therefore, constituted takings of what would otherwise have been Plaintiffs' unencumbered property. According to federal law, however, the right-of-way may not have been abandoned, because the railroad had not filed a notice of consummation of abandonment to finalize the process, as required under STB regulations, *see* 49 C.F.R. § 1152.29(e). But the subsequent NITUs blocked the reversionary process for the purpose of accommodating recreational trail usage, contrary to the scope of the original easement, constituting further temporary takings.

Thus, when on February 4, 2008, the STB issued a new NITU on the CPK corridor, to allow for negotiation of a trail use agreement between K&O and Sunflower, it also effected a taking of the Plaintiffs' property interests by resuming the blocking of the reversionary process. The Sunflower NITU regarding the CKP corridor expired on August 2, 2008, without any trail use agreement having been reached.

The STB issued a NITU on the Hodgeman corridor on March 7, 2008, at the request of HCED. No trail use agreement was reached and the HCED NITU regarding the Hodgeman corridor expired on September 3, 2008. Finally, the STB issued a NITU on the Hodgeman corridor on December 29, 2008, at the request of Sunflower. No trail use agreement was reached and the Sunflower NITU regarding the Hodgeman corridor expired on June 27, 2009.

Is this series of NITUs a series of discrete temporary takings or, taken together, do they in combination constitute a permanent taking? Plaintiffs argue that "the STB's governmental action in the present case of issuing four NITUs and exercising indefinite jurisdiction over the lines constitutes a permanent Fifth Amendment taking." Pls.' Reply at 3. As noted above, Defendant argues to the contrary that, if the court finds a taking, the takings periods were temporary and seriatim, limited to the 180-day period following the issuance of each separate NITU. The court, however, has a different view, namely, that the takings period was continuous from the issuance of the first NITU through, but only through, the expiration of the final NITUs on each of the lines.

In arriving at this conclusion, the Court is guided by the *Barclay* case, in which the Federal Circuit considered the effect of a series of NITUs, much like the issuance of the NITUs here, but in the context of a statute of limitations challenge to the jurisdiction of the trial court to consider the plaintiffs' takings claims. In an effort to keep their complaint alive, the *Barclay*

---

[8] The court notes, however, that K&O had "forever" quit-claimed "all of [its] interests, in lands and premises, right of way, bridges, culverts, easements, buildings, supporting structures, and other fixtures, improvements and appurtenances" in the two rail corridors. Pls.' Ex. 9. The quit-claim deed was recorded in Pratt County on August 23, 2004. *Id.* ATA disclaimed and released its interest in the Pratt County portion of the CKP corridor, as recorded by the Pratt County Register of Deeds on February 25, 2008. There is no indication of whether or how K&O may have recovered its interest in the two corridors.

[9] By this time, the tracks had long been removed, the NITU was no longer in effect, and the railroad was given authorization to abandon (meeting the terms of Kan. Stat. Ann. § 66-525(a)(1)). Thus, the three steps under Kansas law that constitute abandonment – intent, acts, and state or federal authorization to abandon – were all met.

plaintiffs argued that the takings occurred later in time based on such considerations as "when abandonment occurred under state law, when the last NITU in a series was issued, or when the NITU was no longer subject to collateral attack." *Barclay*, 443 F.3d at 1378. The court, however, affirmed the "bright line" rule that the takings claim accrues "when railroad abandonment proceedings are suspended by the STB's issuance of a NITU." *Id*. at 1371 (citing *Caldwell*, 391 F.3d at 1235). "[A] series of STB NITU orders must be viewed as part of a single and continuous government action rather than as new takings. Any other approach would result in multiple potential takings of the same reversionary interest." *Id*. at 1375.

In one instance among the various NITUs issued in the *Barclay* circumstances, the gap between the expiration of one 180-day NITU negotiation period and the issuance of a second NITU affecting the same trail segment was only 10 days. The court did not accept the argument that the second NITU was "a distinct government action that affected a new taking." *Id*. at 1376. Instead, it said "the new NITU in substance merely extended the original NITU." *Id*. The court also observed that the STB had statutory authority to extend the NITU and that the railroad had neither abandoned the right-of-way nor filed a notice of consummation of abandonment in the interim. *Id*.

Similarly, in the recent *Biery* decision in the Court of Federal Claims, the court noted that, although the gap there between the expiration of one NITU and the issuance of a second one was greater than in *Barclay* (approximately 2 ½ months), the "reasoning in *Barclay* is applicable." *Biery*, 2011 WL 2279653 at *14. "The second NITU was in effect a modification and extension of the original NITU." *Id*. The court specifically noted that the STB stated in the second NITU that the original notice of exemption was "modified" to enable a new proposed trail operator to negotiate for trail usage.

Here, although the various follow-up NITUs do not use the term "modified," the STB recites in all of them, as the first item "ordered," that "This proceeding is reopened." The gap in time between the STB's vacation of the original NITU and the NITU for Sunflower regarding the CKP corridor was approximately three months; the gap between the vacation of the original NITU and the NITU for HCED regarding the Hodgeman corridor was approximately four months; the gap between the expiration of the HCED NITU and the NITU for Sunflower regarding the Hodgeman corridor was also approximately four months. As in *Barclay* and in *Biery*, during these periods the STB retained jurisdiction over the rights-of-way and K&O affirmed to the STB in every instance that it had not consummated abandonment.

This court, like the court in *Biery*, finds the reasoning in *Barclay* applicable. Defendant is liable for the taking of Plaintiffs' reversionary interests in the corridors as follows: 1) for the CKP corridor, from the issuance of the original NITU on November 25, 2003, until the expiration of the Sunflower NITU on August 2, 2008; for the Hodgeman corridor, from the issuance of the original NITU on November 25, 2003, until the expiration of the other Sunflower NITU on June 27, 2009.

Because the STB's issuances of the NITUs were the "only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way," *Caldwell*, 391 F.3d at 1233-34,

that is the extent of the Government's taking of Plaintiffs' property.  Defendant is correct in its assertion that "[i]n the absence of conversion of the corridor to a recreational trail, once the NITU expires," K&O was no longer precluded by federal government action from completing the abandonment of the two rail corridors.  Def.'s Reply at 21. Even Plaintiffs implicitly conceded this point in stating, ""[t]he railroad, in this case, the K&O, holds the key to completing the regulatory abandonment process." Pls.' Resp. at 16-17.

    IV.    Conclusion

For the reasons stated above, Plaintiffs' motion for summary judgment is GRANTED and Defendant's motion for summary judgment is DENIED, to the extent that the Court finds Defendant liable for a taking of Plaintiffs' property without just compensation.  The Court finds in favor of Defendant (in part) and against Plaintiffs with respect to the temporary duration of the taking, but that it was a continuous taking during the periods noted.

On or before July 22, 2011, the parties shall file a joint status report recommending to the Court how they wish to proceed in this case.

    s/ Edward J. Damich
    EDWARD J. DAMICH
    Judge